(No. 33316.—

THE CITY OF CHICAGO, Appellant, *vs.* CHICAGO AND NORTH
WESTERN RAILWAY COMPANY, Appellee.

*Opinion filed November 18, 1954.*

JOHN J. MORTIMER, Corporation Counsel, of Chicago,
(ROBERT J. NOLAN, WALTER V. LESAK, and BRIAN M.
KILGALLON, of counsel,) for appellant.

DRENNAN J. SLATER, EDWARD WARDEN, and JORDAN
JAY HILLMAN, all of Chicago, for appellee.

Mr. JUSTICE DAILY delivered the opinion of the court:

This is an appeal by the city of Chicago from a judg-
ment of the circuit court of Cook County entered in favor
of the Chicago and North Western Railway Company, the
defendant in an action brought by the city for a declaratory

judgment enforcing a contract the parties had entered into on December 31, 1906.

The pertinent facts show that prior to 1884, North Halsted Street, at a point immediately south of the Chicago River, extended across railroad tracks at grade. In that year a viaduct for street traffic was constructed over the tracks, its northern terminal abutting the city's bridge by which Halsted Street passed over the river. It is not clear who bore the expense of constructing the viaduct but defendant, in its brief filed here, says that it did so. In 1906, the city enacted an ordinance authorizing defendant to build a passenger station and, by its terms, vacated certain properties and granted rights of way for which defendant paid in excess of $155,000, and assumed other obligations. During the same year, on December 31, the city and defendant entered into a contract, for the further consideration of $1.00, which made the following provision relative to the viaduct previously described: "Whenever a new bridge is constructed at Grand Avenue, Erie Street or North Halsted Street and the viaducts, now existing over the tracks of said railway company at the approaches of said bridges, or any of them, shall become insufficient and unsafe to accommodate the needs of the public, then said railway company shall remove said viaduct and construct a new one of sufficient width to accommodate the public and according to plans approved by the Commissioner of Public Works of said City, and the entire cost and expense of such removal and construction shall be borne by said railway company."

In 1913 the legislature of this State enacted a Public Utilities Act which became effective January 1, 1914, (Laws of 1913, pp. 459-502,) vesting general supervision over all public utilities, including railroads, in the Public Utilities Commission which, by the act of 1921, became the Illinois Commerce Commission. (Laws of 1921, pp. 702-754.) The third paragraph of section 58 of the act (Ill. Rev.

Stat. 1953, chap. 111⅔, par. 62,) makes this provision: "The Commission shall also have power by its order to require the reconstruction, alteration, relocation or improvement of any crossing (including the necessary highway approaches thereto) of any railroad across any highway or public road, whether such crossing be at grade or by overhead structure or by subway, whenever the Commission finds after a hearing that such reconstruction, alteration, relocation or improvement is necessary to preserve or promote the safety of the public or of the employees or passengers of said railroad. By its original order or supplemental orders in such case, the Commission may direct such reconstruction, alteration, relocation or improvement to be made in such manner and upon such terms and conditions as may be reasonable and necessary and may apportion the cost of such reconstruction, alteration, relocation or improvement between the railroad company or companies and other public utilities affected, or between such company or companies and other public utilities affected, or between such company or companies and other public utilities and the State, county, municipality, or other public authority in interest. The cost to be so apportioned shall include the cost of changes or alterations in the equipment of other public utilities affected as well as the cost of the relocation, diversion or establishment of any public highway, made necessary by such reconstruction, alteration, relocation or improvement of said crossing."

At this time, many years after the execution of the contract and the enactment of the statute, the city is engaged in a program of improvements, necessitated by the increase of vehicular traffic, which include the construction of a new and larger bridge by the city at the Halsted Street river crossing. The new bridge will be sixty-six feet wide, will have a roadway of forty-six feet and, when completed, the roadway elevation will be six feet, three inches, above the point where the old bridge presently joins the viaduct.

In contrast, the viaduct is but forty-nine feet wide overall with a roadway of twenty-eight feet and, in addition, is of a type which has steel girders projecting along and above the length of its surface. The city's plans call for a widening of the viaduct, increasing its elevation, and eliminating the protruding girders. It was to this end, therefore, that the city sought a declaratory judgment to enforce the contract of December 30, 1906, and place the cost and expense of reconstructing the viaduct on the defendant railway.

Defendant filed a motion to dismiss the complaint maintaining, as it has consistently done, that the contractual provisions have been superseded and rendered null and void by the provisions of the Public Utilities Act and that exclusive and plenary jurisdiction over the subject matter, including the apportionment of costs of the reconstruction, is vested in the Commerce Commission. The motion was denied however, and in support of his ruling the hearing judge rendered an opinion which, in substance, was that the city could enforce the contract because it was not the legislative intent to grant the Commerce Commission the power to relieve utilities of obligations existing and entered into before the creation of the Commission, and which, as here, were not originated under the city's police power but under an agreement in which defendant obtained great benefits for itself; that defendant in pleading the exclusive jurisdiction of the Commission over the subject matter is seeking not to avoid the building of the viaduct but to avoid paying for it; and that to allow defendant's theory to prevail would result in the abridgement of the obligation of contract.

When the final pleadings were made the trial court was of the opinion that issues of fact were involved and, accordingly, the following interrogatories were submitted to a jury: "(1) Is the present viaduct the one existing on December 31, 1906? (2) Is the viaduct insufficient and unsafe to accommodate the needs of the public?" The jury

answered "Yes" to the first and "No" to the second. Based upon these replies the court entered a judgment denying the city's petition for a declaratory judgment and included therein an order stating the contract was not enforcible by virtue of the legal effects of the subsequently enacted Public Utilities Act, and that exclusive and plenary jurisdiction over the subject matter is in the Illinois Commerce Commission.

In appealing to this court, the city urges that section 58 of the Public Utilities Act, (Ill. Rev. Stat. 1953, chap. 111⅔, par. 62,) as applied in the judgment of the trial court, invalidly impairs the obligations of a contract in violation of both State and Federal constitutions; that the contract in question does not limit the police powers of the Commission, and that exclusive jurisdiction to apportion costs does not lie with the Commission, where, prior to the creation of the Commission there existed a valid contract which in no way limits the police power, and which fixes only the responsibility for cost.

Although the city draws many distinctions and advances numerous arguments to the contrary, we find that *City of Chicago* v. *Commerce Com. ex rel. Chicago and Western Indiana Railroad Co.* 356 Ill. 501, is decisive and controlling as to the main issues presently raised. In that case, which we shall hereafter refer to as the *Ninety-fifth Street case,* the city enacted a track elevation ordinance in the year 1911, requiring certain railroads to elevate their tracks and to build subways under the tracks at the sole expense of the railway companies, the purpose being to eliminate crossings at grade. The companies filed an acceptance of the ordinance within the required time. After the Public Utilities Act was passed, the city commenced a proceeding before the Commerce Commission charging that public convenience and necessity required a subway under one railroad's tracks at Ninety-fifth Street near Stony Island Avenue. In accordance with the terms of the ordi-

nance, the city sought to compel the railroad to construct the subway at the latter's sole expense. The Commission found that public safety and convenience necessitated the grade separation and entered an order apportioning the cost of the subway between the railroad and the city. The circuit court of Cook County affirmed the order and, on appeal to this court, we held, with two justices dissenting, that the effect of the Public Utilities Act was to make the power to apportion the expense of eliminating a grade crossing inseparable from the power to determine its necessity and manner of accomplishment, and that when the act came into force, the power of the city over grade separations ceased to exist, making the city incapable of passing new ordinances or of enforcing existing ordinances with reference to such matters which the act placed within the exclusive jurisdiction of the Commerce Commission. We also rejected an argument that the act violated the constitutional prohibitions against impairment of the obligations of a contract. The dissenting justices stated only that it was their opinion that the case was controlled by *Missouri, Kansas & Texas Railway Company* v. *Oklahoma,* 271 U.S. 303, 70 L. ed. 957, a decision neither discussed nor distinguished in the majority opinion.

Unless there is merit to distinctions urged by the city, the principles of the *Ninety-fifth Street case* are the ones to be applied here, for section 58 of the Public Utilities Act (Ill. Rev. Stat. 1953, chap. 111⅔, par. 62,) clearly vests the Commerce Commission with plenary and exclusive jurisdiction over the entire subject matter of the contract, which involves: (1) the safety of the viaduct supporting the street over defendant's tracks, (2) the necessity of reconstructing the viaduct, (3) the specifications of the viaduct to be reconstructed, and (4) the assessment of the cost of reconstructing the viaduct.

The city first urges that the contractual provision as to the payment of the entire cost of reconstruction by the

railroad does not in any way limit the police powers of the Commission and is, in fact, not an exercise of police power but a voluntary contract provision entered into under the city's ministerial powers, based on a valid consideration, and made at a time when there was no compulsion on the defendant to reconstruct the viaduct at its own expense. It is also argued that the proposed reconstruction of the bridge and viaduct is incidental to improving existing traffic conditions on its streets, over which it has exclusive jurisdiction, and does not relate to the elimination of the danger from railroad operations; that the primary concern of the Commerce Commission is not with the payment for such reconstruction, but is to determine if it is sufficient to preserve and promote public safety; and that the legislature did not intend the Commerce Commission to have police power to the extent that the city could not collect on contracts entered into with defendant prior to the passage of the Public Utilities Act.

In support of its contentions, the city relies heavily upon three cases, the first of which is *Kansas City* v. *Kansas City Terminal Railway Company*, 324 Mo. 882, 25 S.W. 2d 1055. In that case, where there was also a divided court, the city sought to compel the railroad to construct, at its own expense, a viaduct which was necessitated by a city plan to extend a certain street. Prior to that time, in connection with ordinances which enabled the railroad to get vacations and rights of way necessary to the construction of a station, the railroad had accepted a contractual ordinance agreeing to construct viaducts at certain designated points. When the railroad refused to comply with the viaduct ordinance the city started suit for specific performance and was granted relief. On review, the Missouri Supreme Court, after stating they had found no case holding that such a contract was an abridgment of the police power, affirmed the trial court and held that the city was not invoking the police power vested in the Public Service

Commission to have the cost of the viaduct apportioned to the railroad, but was seeking to have a contract specifically enforced. There is thus recognition by the court that the apportionment of costs is an exercise of the police power, and while the case is strongly persuasive, it cannot control in the light of our decision in the *Ninety-fifth Street case* that such element of police power cannot be separated from the powers, vested exclusively in the Commerce Commission, to require the improvement and to direct the type of construction. It should be noted too that interpretations of Missouri law relative to powers over extension of streets which the court held could not be destroyed by the subsequent enactment of a police regulation of the character involved, factors not present here, were also relied upon by the court for its decision.

The next case advanced by the city in support of its position that the contract here should not be construed as an exercise of police power is *Missouri, Kansas & Texas Railway Co.* v. *Oklahoma,* 271 U.S. 303, 70 L. ed. 957, which the dissenting justices in the *Ninety-fifth Street case* felt controlled the issues there. In the *Oklahoma case* there was involved an ordinance by which the city of McAlester and the railroad had agreed that, if the city decided to open and extend a certain street across the railroad's right of way and station grounds, there would be an underpass to be constructed at the city's expense. Thereafter, when the city sought to accomplish that purpose it filed a petition with the State utilities commission and that body ordered the railroad to prepare a plan for a concrete subway and provided that if the city and company failed to agree on an apportionment of the cost, the commission would hear evidence on the subject. On review to the Supreme Court of Oklahoma, at the instance of the railroad, the court held that State laws gave the commission full jurisdiction over all highway rail crossings and that the commission had authority both to order the underpass

and to apportion its cost. On writ of error the Supreme Court of the United States reversed the State court and while it is apparent the court did not consider the city's ordinance as an attempt to interfere with or hinder the proper exercise of the police power, the decision was not based upon a consideration of police power but was actually bottomed on the court's reasoning that the contract ordinance was, in effect, an agreement or settlement between the city and the railroad, in lieu of eminent domain proceedings, for the taking of the railroad's property. This is manifested at 271 U.S. 303, 309, where the court said: "The company's agreement to grant a right of way for the crossing was a valid consideration for the city's undertaking to bear the cost of construction." Similar facts are not present in this case and we think the *Oklahoma case* is not to be considered as controlling under our statute, which expressly makes the apportionment of costs an exercise of the police power vested exclusively in the Commerce Commission.

The last case extensively relied upon by the city is that of *City of Chicago* v. *Pittsburgh, Cincinnati, Chicago and St. Louis Railway Co.* 244 Ill. 220, which was decided before the enactment of the Public Utilities Act and appears to have little value, factually or substantively, as a binding precedent. In that case the city was held to be bound by the terms of a track elevation ordinance wherein it agreed to release the railroad from damage claims which had arisen when certain viaducts had been built under the authority of an earlier ordinance. The city argued that it could repudiate its agreement for lack of consideration, inasmuch as the city could have compelled the track elevation under its police power without agreeing to release the railroad. In rejecting the argument this court held that the track elevation ordinance in that instance was not merely an exercise of the police power because the railroad agreed to do many things which it could not otherwise

have been compelled to do and found that such acts were sufficient consideration for the city's waiver of indemnity. In the present case the city rationalizes that because we held it bound by the agreement in that case, that we should now bind the railroad to its agreement to pay for reconstruction of the viaduct. We think that such a contention overlooks that the city's waiver of indemnity, in exchange for certain acts which it could not compel the railroad to do under its police power, was solely an exercise of its contractual powers. In this case, however, what the city is seeking to have the railroad do, namely to pay the cost of reconstructing the viaduct, is, by our statute, an exercise of the police power. We see no compelling similarity between the cases.

After a full consideration both of the authorities relied upon by the city and of minor factual differences which we feel are unnecessary to detail or comment upon, we find nothing which causes us to depart from the principles established in the *Ninety-fifth Street case*. We conclude, therefore, as we did there, that the apportionment of the cost of reconstruction of the viaduct over the grade crossing in question is an inseparable element of the police power which is vested exclusively in the Commerce Commission, and that it may not be abrogated by the contract the city seeks to enforce.

In a further effort to maintain its position that the Commission's jurisdiction over the apportionment of reconstruction costs is not exclusive, the city points out that paragraph three of section 58, in contrast to the earlier paragraphs, employs the permissive terms "may direct" and "may apportion costs" and interprets them to mean that the Commission may act to apportion only if the parties cannot agree on the question of costs. In *Chicago Junction Railway Co.* v. *Commerce Com.* 412 Ill. 579, 588, we held that the use of the word "shall" instead of "may" in the

paragraph would have reduced the area of the Commission's discretion by making it "mandatory upon the Commission to assess every party who could conceivably be affected by reconstruction, alteration, relocation, or improvement." Thus it would appear that despite the term used it remains the exclusive function of the Commission to apportion costs. Although it may not be necessary to apportion if the parties can agree, it is clear that such an agreement would have to originate after the passage of the act, otherwise the police power of the Commission to act for the public safety and welfare could be abridged by agreements defeating that purpose and perhaps entered into at a time when one of the parties may have had little alternative in the matter. In any event, the transfer of the police functions to the Commission carries with it the abrogation of prior contracts which in any way affect the exercise of the police power and we must conclude that the use of the permissive words was not intended to limit the jurisdiction of the Commission.

The last contention of the city to which we need to give consideration is that the ruling of the trial court deprives the city of its rights under the constitutional guarantees against impairment of the obligations of contract. This same point was raised in the *Ninety-fifth Street case* where we held that contracts of this character were subject to modification by statutes enacted in a *bona fide* exercise of the police power. What we said there need not be repeated here, for we find nothing in the city's position or argument which compels a different conclusion in this case. It has long been established that the constitutional prohibition in question does not prevent a proper exercise by the State of its police power of enacting regulations reasonably necessary to secure the health, safety, morals or general welfare of the community, even though contracts may thereby be affected, for such matters cannot be

placed by contract beyond the power of the State to regulate and control them. (*Town of Cheney's Grove* v. *Van-Scoyoc,* 357 Ill. 52; *City of Chicago* v. *Washingtonian Home,* 289 Ill. 206; *Public Utilities Com. ex rel. Quincy Railway Co.* v. *City of Quincy,* 290 Ill. 360.) As was pointed out in *Hoyne* v. *Chicago and Oak Park Elevated Railroad Co.* 294 Ill. 413, 421, the same principles serve to answer the city's contention that the trial court's ruling violates section 23, article IV, of the Illinois constitution. In that case we said: "The liability or obligation spoken of in that section of the constitution only has reference to liabilities and obligations which the corporation and the municipality have the legal right and power to make, not only as between themselves but also as against the right of the State to interfere." It is axiomatic that the police power is inherently necessary to the effective conduct and maintenance of government, thus we do not construe the constitutional provision relied upon as creating a bar to the *bona· fide* exercise of that power which is found in this case.

It will be recalled that the court below submitted issues of fact to a jury to determine whether there had been compliance with the conditions precedent specified in the contract in question. Inasmuch as exclusive and full jurisdiction over the subject matter is vested in the Commission, we make the final observation that nothing in this opinion should be taken to mean that the submission of the factual issues to the jury could in any way bind the Commission in its determination of whether the proposed reconstruction of the viaduct is necessary to promote the safety and general welfare of the public.

The order of the circuit court of Cook County denying the city's petition for a declaratory judgment is affirmed.

*Judgment affirmed.*